**Ethel HOLMAN, as Guardian for M. C. Mac Holman, an Incompetent, Plaintiff,**

**v.**

**T.I.M.E. FREIGHT, INC., Defendant.**

Civ. A. No. 1795.

United States District Court
W. D. Arkansas,
Fort Smith Division.

Dec. 28, 1964.

Pat Pate, Poteau, Okl., Garner & Parker, Fort Smith, Ark., for plaintiff.

Thomas Harper, Fort Smith, Ark., for defendant.

JOHN E. MILLER, Chief Judge.

On November 22, 1963, between 8:30 and 9:00 a. m. there was a collision on U. S. Highway 64 at a point approximately 1¼ miles east of Webbers Falls, Oklahoma, between a large tractor trailer owned by defendant and driven by an employee of defendant and a Chevrolet automobile owned by the plaintiff, Ethel Holman, and her husband, M. C. Mac Holman. In the collision M. C. Mac Holman received serious personal injuries.

On January 24, 1964, the LeFlore County Court found M. C. Mac Holman to be an incompetent, and the court appointed the plaintiff, Ethel Holman, as his guardian.

On May 13, 1964, the plaintiff guardian filed her complaint seeking to recover a large sum of money as damages for the personal injuries received by her ward, Mr. Holman. In the complaint the plain-

tiff, alleged that the tractor trailer was being driven in an easterly direction in a careless and negligent manner on the highway, hereinbefore referred to, and at the same time the plaintiff guardian was driving in a westerly direction the Chevrolet automobile in which the now incompetent was a passenger. The collision occurred in a large U-shaped curve immediately north and east of the Missouri Pacific Railroad tracks at a point a short distance from the narrow bridge across the Arkansas River at or near the north corporate line of Webbers Falls, Oklahoma.

The specific acts of negligence alleged by plaintiff are that the defendant, acting through its employee, was careless and negligent in the driving of the tractor trailer by:

"(a) In driving at a fast and dangerous rate of speed considering the conditions then and there existing.

"(b) In failing to keep a proper lookout for other persons and property rightfully upon said highway.

"(c) In failing to keep its vehicle under proper control considering the conditions then and there existing.

"(d) In failing to stop.

"(e) In operating a defective vehicle in that the brakes were improper, unlawful, and illegal, and the tires on said vehicle were defective and same did not comply to law; also the wheel housing on said vehicle were defective.

"(f) In driving its vehicle on the wrong, improper, and left-hand side of the highway."

That as a direct and proximate result of the alleged negligent acts of the employee of defendant, the passenger, Mr. Holman, received serious injuries which resulted in total and permanent disability. Following these allegations, the plaintiff specifically alleged the nature and extent of the injuries received by Mr. Holman.

The defendant filed its answer on July 2, 1964, in which it admitted that the tractor trailer was being driven and operated by Henry C. Newberry, Jr., an employee of defendant who was acting within the scope of his employment at the time. It denied that the said employee was guilty of careless and negligent acts in the operation of the tractor trailer and denied that it is liable to the plaintiff on account of the injuries alleged to have been sustained by Mr. Holman.

The defendant did not plead that the plaintiff was guilty of contributory negligence, and there was no such contention made at the trial.

The parties did not request a trial by jury and the case was tried to the court on November 24, 1964, and this opinion, containing findings of fact and conclusions of law, is filed as authorized by Rule 52(a), Fed.R.Civ.P.

█ The plaintiff, Ethel Holman, and M. C. Mac Holman are now and were at the time the suit was commenced citizens of the State of Oklahoma and residents of LeFlore County, Oklahoma. The defendant, incorporated under the laws of the State of Delaware with its principal place of business at Lubbock, Texas, is authorized to engage in the business of transportation of goods, wares and merchandise upon the highways both in Oklahoma and Arkansas. Jurisdiction exists by reason of diversity of citizenship of the parties and the amount involved, 28 U.S.C. § 1332(a), (1963 Supp.). The law of the State of Oklahoma governs and fixes the substantive rights of the parties.

U. S. Highway 64, as its number would indicate, runs in a general east-west direction. The collision between the vehicles occurred in a large U-shaped curve, which to a vehicle traveling in an easterly direction curves to the right and to a vehicle traveling in a westerly direction would curve to the left at the point of impact. At the point of impact the concrete paved portion of the traffic

lane for vehicles proceeding in an easterly direction was slightly more than 18 feet wide with a black-top asphalt shoulder of slightly more than 10 feet. The width of the traffic lane for vehicles moving in a westerly direction was slightly more than 11 feet wide with a black-top asphalt shoulder of slightly more than 9 feet in width. The lanes of traffic were divided by a broken center line.

The plaintiff and Mr. Holman left Spiro, Oklahoma, for Muskogee, Oklahoma, about 8:00 a. m. accompanied by the half-sister of plaintiff, Mrs. Ethel Holman. At that time and prior thereto Mr. Holman had been receiving treatment for various ailments at the Veterans Hospital in Muskogee. During that part of the journey from Spiro to the point of the collision it had rained, but was not raining at the time of the collision of the vehicles.

The tractor trailer had stopped at the west end of the narrow bridge across the Arkansas River to allow traffic moving from the east to the west to clear the bridge. While thus waiting to enter the bridge, an automobile driven by a young lady passed the tractor trailer and preceded it across the bridge. As the tractor trailer proceeded easterly across the bridge and upon the highway, the automobile driven by the young lady continued in front of the tractor trailer. The speed of the tractor trailer was approximately 40 to 45 miles per hour after it crossed the bridge until it approached the railroad tracks of the Missouri Pacific Railroad, which cross the highway a short distance west of the intersection of State Highway 10 from the north. About that time the driver of the tractor trailer noticed that the young lady in the automobile ahead was preparing to make a left turn into State Highway 10, which extends from U. S. Highway 64 in a northerly direction to the small municipality of Gore, Oklahoma. When the driver of the tractor trailer observed the signal given by the young lady, who was personally known to him, he slowed the speed of the tractor trailer in order to give her an opportunity to leave the highway. About that time a car driven by another young lady had come from the north on Highway 10 and had stopped at the stop sign at the intersection of Highways 10 and 64. Immediately after the car which had been preceding the tractor trailer made the turn into Highway 10, the other automobile which had come from the north or from Gore entered the highway and the lane of traffic occupied by the tractor trailer, and proceeded easterly along the highway in front of the tractor trailer. The driver of the tractor trailer had entered into the curve a distance of 400 or 500 feet when he applied his brakes which caused the trailer to jack-knife, and the rear end of the trailer crossed the center line of the highway into the traffic lane for westbound vehicles. At that time the plaintiff and Mr. Holman were traveling westerly in their proper lane of traffic at a speed of approximately 35 miles per hour. Upon seeing the invasion of their lane of traffic by the rear end of the trailer the plaintiff, Mrs. Ethel Holman, immediately applied the brakes on her automobile. The tracks made by the right wheels of the automobile were clearly visible for a distance of 25 to 30 feet easterly from the point of impact. The impact between the left front of the automobile and the left rear corner of the tractor trailer occurred approximately 3 feet over the center line in the westbound traffic lane. For a distance of 4 or 5 feet from the place where the automobile stopped, the left front wheel left heavy tread marks upon the highway, indicating that when the automobile and the trailer collided, the weight of the tractor greatly depressed the left front end of the automobile. A photograph of the automobile taken after the collision reveals that beginning with the hood of the automobile, the roof portion of the automobile was crushed and turned backwards into and across the front seat in which the occupants of the automobile were riding. The driver of the automobile, as well as her half-sister, sustained injuries. However, the injuries sustained by the ladies

were minor when compared to the injuries received by Mr. Holman. At the time of the collision Mr. Holman was sitting next to the right front door, and the half-sister of plaintiff was sitting in the middle between the plaintiff and Mr. Holman.

The driver of the automobile that entered the east traffic lane of U. S. Highway 64 from State Highway 10 did not testify. There was testimony as to the name of the driver, but neither side called her as a witness, and the record is silent as to whether she was available as a witness. However, the plaintiff driver of the Chevrolet stated that she had met and passed an automobile that was proceeding at a distance of approximately 150 feet east of the tractor trailer, and at the time the driver of the tractor trailer applied his brakes and the trailer jack-knifed, the distance in her opinion between the tractor trailer and the automobile in front of the tractor trailer was estimated by the plaintiff to be approximately 100 feet.

The only witness introduced by the defendant was the driver of the trailer tractor. He was 36 years old and had been driving a tractor trailer for nine years. He was living at Sallisaw, Oklahoma, and his run or route was from Sallisaw to Oklahoma City and return. It usually required nine to ten hours to make the round trip. He had left Sallisaw at 7 p. m. the night before the accident and was returning to Sallisaw on the morning of the accident. He arrived at *Webbers Falls,* a short distance from the scene of the accident, at 8:15 a. m. He had actually been on the trip at that time 13 and ¼ hours. The trailer was 40 feet long, and when coupled with the tractor, the entire unit was 50 feet in length. There was no testimony as to the weight of the unit or the contents of the trailer. He was in the curve, which, as heretofore stated, curved to the right for vehicles proceeding in an easterly direction, so that in the event of a jack-knife the trailer would naturally swing to the left into the traffic lane for vehicles traveling in a wester-

ly direction. The unit was so large or heavy that the driver did not know that there had been a collision with the automobile of plaintiff until he had proceeded some distance and then discovered it by looking through the side-view mirror. The testimony did not disclose the speed at which the automobile in front of the tractor was traveling, but the driver testified that he was traveling less than 20 miles per hour when he applied the brakes, that the automobile in front of him had slowed its speed for some unknown reason and he was within 20 feet of it when he applied the brakes on the tractor trailer.

An Oklahoma highway trooper, Don Mentzer, stationed at Sallisaw, reached the scene of the accident shortly after it had occurred. At that time the plaintiff's automobile was still in the road at the point of impact, while the tractor trailer was considerably east of the point of impact. The driver of the tractor trailer stated to the trooper that he had been up all night and that he was traveling between 40 and 45 miles per hour in the curve. The trooper further testified that at the entrance of the curve a highway sign showed 35 miles per hour as the recommended speed and that the maximum speed limit for trucks on the highway in that area was 50 miles per hour.

The court is of the opinion that the tractor trailer was traveling considerably faster than 35 miles per hour at the time of the collision during the time it was following the automobile that had entered from Highway 10 ahead of the tractor trailer.

As heretofore stated, the defendant did not plead that the plaintiff or Mr. Holman was guilty of contributory negligence and there was no such contention made at the trial, or evidence introduced, indicating that plaintiff or Mr. Holman was guilty of contributory negligence. A consideration of all of the evidence convinces the court that the driver of the tractor trailer was guilty of negligent acts and omissions which singularly and concurrently were the

proximate cause of the collision and consequent injuries, by driving at a fast and dangerous rate of speed considering the conditions and circumstances that existed at that time; in failing to keep an efficient and proper lookout for other persons and property legally on the highway; in failing to keep the tractor trailer under proper control; and by applying the brakes to the tractor trailer with such force that he knew, or should have known, that the trailer would likely jack-knife from its traffic lane into the traffic lane of the plaintiff.

The occupants of the automobile were moved by ambulance from the scene of the collision to the Veterans Hospital at Muskogee, where Mr. Holman was accepted as a patient. The driver of the automobile and her half-sister were taken to the General Hospital at Muskogee where they remained for a short time.

Mr. Holman had formerly been engaged in various businesses, but in recent years had operated a jewelry store and a watch-repairing shop at Poteau, Oklahoma. He retired in 1961 and since that time had not worked regularly at any occupation, but had been working around his home in Poteau, Oklahoma, and had been personally mowing his lawn, working the trees, shrubs and flowers, attending to everday business affairs, and doing other necessary things around the home. Occasionally he would go fishing. His wife was working, and he often did the cooking, washing the dishes and other chores.

He served in World War I and the discharge received by him indicated a leakage of the heart, probably caused by a severe attack of influenza. At the time of his injuries on November 22, 1963, he was drawing a pension of $60 per month as a result of his service in World War I, and was also drawing Social Security benefits. Those two monthly checks constituted his income, which, as above stated, was supplemented by the income of his wife as a waitress at various restaurants.

Mr. Holman at the time of the collision was 66 years old and, as heretofore stated, retired. Prior to the injuries received in the accident he had a medical history of cerebral arteriosclerosis, paralysis agitans, and leukoplakia of the mouth. In the accident he received an injury to the right side of his head. As a result of this injury he was hospitalized in the Veterans Administration Hospital, Muskogee, Oklahoma. Mr. Holman was unconscious when removed from the automobile and remained unconscious for a period of approximately six weeks and semi-conscious for the remainder of the time while he was in the Veterans Hospital at Muskogee. Since that time he has been unable to control any of his body functions and is incapable of attending to his personal needs. He is unable to feed himself and is not ambulatory. He is completely unable to care for even his most simple needs. After release from the Veterans Administration Hospital, he was removed to another Government facility at Ardmore, Oklahoma. While at that facility his condition seemed to deteriorate, and he was transferred to a Government hospital at Sulphur, Oklahoma, where he remained for a period of time. Then he was removed to a local nursing home at Spiro for a while and thence back to the Ardmore institution. He was removed from that institution to a nursing home at Poteau, Oklahoma, on Sunday, November 22, and was brought from that nursing home at Poteau to the trial on Tuesday, November 24, where he remained for some two or three hours during the trial, when it was necessary to return him to the nursing home at Poteau, Oklahoma. He was not called as a witness because he was mentally and physically unable to testify.

Dr. William G. Lockhart, a neurological surgeon of admitted competency of the Holt Krock Clinic of Fort Smith, Arkansas, at the request of defendant examined Mr. Holman on September 22, 1964, subsequent to his accident. Dr. Lockhart's report was made to the attorneys for the parties on October 28, 1965. He was called as a witness by the plaintiff and testified that his exami-

nation disclosed that although Mr. Holman's sensory modalities seemed to be intact, he had insufficient intellectual attention to communicate and his intellectual grasp was nil; that he had no attention span or retentive ability whatever; that his reflexes were hyperactive and although his coordination ability was basically intact, he was unable to voluntarily control them because of the damage to his central nervous system and its deterioration.

An electroencephalogram performed by the witness and analyzed by Dr. Robert Woolsey of St. Louis University reflected a range within normal limits. The witness also noted a jaw jerk and a sucking reflex in his mouth, the result of cranial nerve disease; the eyes revealed some arteriosclerotic changes of the retina although the pupils were equal and reacted well. Mr. Holman throughout the examination exhibited a mask-like face. The witness noted that when Mr. Holman attempted to walk he leaned forward and "chased the center of gravity," which describes the effect of Mr. Holman's falling forward when he attempts to walk.

Although Dr. Lockhart did not examine Mr. Holman prior to the accident and had not treated him, he did review records of the Veterans Administration with respect to Mr. Holman's past history of arteriosclerosis and paralysis agitans. These disabilities, in conjunction with the injury received in the accident, render Mr. Holman permanently and totally disabled. The intellectual loss which results from the deterioration of his existing conditions, as aggravated by the injury received in the automobile accident, prevents his exercising even the most rudimentary intellectual efforts. The witness stated that although it was possible that the paralysis agitans and the cerebral arteriosclerosis conditions could result in the totally impaired condition that Mr. Holman was in, it was aggravated by the injury received in the automobile accident. Paralysis agitans in its normal course affects the basal ganglia area of the brain, resulting in

progressive motor control deterioration. Paralysis agitans is a rapidly progressive disease with a normal duration of five to ten years, resulting in complete disablement. Cerebral arteriosclerosis is also progressive and, as stated by the witness, has the capability of resulting in Mr. Holman's present condition of total disablement. As to the condtion of Mr. Holman's mouth, leukoplakia, Dr. Lockhart did not consider this a factor in Mr. Holman's present condition.

Based upon Mr. Holman's prior medical records and his history with respect to his daily activities prior to the accident, and considering the unconscious state after the accident, Dr. Lockhart stated that his present condition was aggravated by the injuries received in the automobile accident, and they, in combination with his pre-existing condition, placed him in his present condition.

Dr. Lockhart summarized Mr. Holman's condition as a diffused brain with organic mental changes, a disturbance of the motor control functions, inability to grasp even the simplest commands with respect to motor functions, disease of the basal ganglia which deals with the finer motor functions and an incapacity to voluntarily control the normal body functions.

The physical and mental condition of Mr. Holman is such that it is necessary to keep him in an institution with a nurse or someone in constant attendance capable of caring for him at all times. The minimum cost for such will be $300 per month, plus $1.00 per day for medicine, and when a physician is necessary, the charge will be $5.00 per visit.

The court has heretofore stated the names and locations of the Government institutions in which Mr. Holman was hospitalized. The court assumes that the expense of keeping Mr. Holman in the various Government institutions was paid by the Government as there was no evidence introduced as to such costs except that there had been expended the sum of $34.80 for drugs; the sum of $197.50 was paid to the Spiro nursing home for the time that he was there;

that $119.35 was paid to the Oklahoma War Veterans Home, and during the months of July, August, September, October and November, $350.00 was paid to "Soldiers' Home at $70 per month." Also, Dr. R. J. Friedman was paid the sum of $13.00 for services. Thus, the total sum of $714.65 had been expended at the time of the trial. Other expenditures were claimed, but the court believes that the above are the only past expenses that should be allowed.

The defendant in its brief stated:

"It seems to the defendant that the principle, and perhaps the only, question for decision in this case is how much, if any, of the plaintiff's present disability and deteriorated physical condition can be said to have been proximately caused by the automobile accident involved, and in this connection, it seems that the court can look only to what medical testimony is available."

The plaintiff in her brief contends that she is entitled to recover the sum of $139,520.00.[1]

The defendant vigorously contends that the record is wholly silent as to any medical testimony indicating the extent of the physical injuries received by Mr. Holman in the accident.

It will be remembered that Mr. Holman was examined at the request of the defendant by Dr. Lockhart of Fort Smith, and the report of his examination was made to the attorneys for the parties. The plaintiff did not introduce the testimony of the physician or physicians who treated Mr. Holman during the time that he had been a patient at the Veterans Hospital prior to the accident or during the time that he was there following the accident, and because of such failure of the plaintiff to produce testimony showing the extent of the physical injuries received by Mr. Holman in the accident and the extent of the pre-existing diseases, the defendant contends that there is no basis for an award of damages for the injuries received in the accident.

Dr. Lockhart, prior to the examination of Mr. Holman, obtained a history from two sources, primarily Mrs. Holman and records were furnished him from the Veterans Hospital at Muskogee. Mr. Holman was in no condition to give a concise history of the accident or of his pre-existing condition. Dr. Lockhart's conclusions were reached from the history obtained, and it was his impression "that this man was totally and permanently disabled, and whatever pre-existing central nervous system disease that he may have had was augmented and aggravated by the acute head injury of November 1963." (There was no objection to the testimony of Dr. Lockhart based upon the information obtained from those sources, and the reports from the Veterans Administration, if they were available, were not introduced into evidence.)

Without doubt Mr. Holman, prior to the accident, was able and did attend to such business affairs as he and Mrs. Holman had, and he mowed the lawn, trimmed the trees and bushes, built various bird houses and made other improvements in and around the home, and occasionally went fishing. Apparently he attended to all the household chores, and frequently visited with friends downtown on various occasions. In other words, the pre-existing diseases had not disabled him prior to the accident, but since the accident he is now totally and permanently disabled. He is effectively removed from the ordinary activity of a man 66 years of age.

1. Pain and suffering, $20,000; permanent physical injuries, $72,000; cost of keeping Mr. Holman in nursing home at Spiro for the remainder of his life at $330 per month (the testimony showed the cost to be $300 per month), $47,520, or, in the alternative for a nurse for 8-hour shift, $5,475 per year for 12 years, or a total of $65,700 for one nurse. The nurse cost, however, would be correspondingly increased if more than one nurse were required per day.

In 15 Am.Jur., Damages, Sec. 80, p. 488, the rule is stated as follows:

"In an action for damages for personal injuries caused by a wrongful act or omission, the injured person is entitled to recover full compensation for all damages proximately resulting from the defendant's act, even though his injuries may have been aggravated by reason of his pre-existing physical condition, rendered more difficult to cure by reason of his state of health, or, by reason of a latent disease, the injuries were rendered more serious to him than they would have been had he been in robust health. The defendant cannot invoke the previous condition of the person injured for the purpose of escaping the consequences of his own negligence or reducing the damages for which he is liable."

On re-direct examination of Dr. Lockhart, counsel for the plaintiff propounded the following questions:[2]

"Q. I am asking you if we assume that on the 21st day of November, 1963, that this man, which was the day before the accident, that this man—well, was able to transact his business, visit with the banker, go fishing, make bird houses, clip his lawn and his trees and cook dinner for his wife, assuming those things to be true, what, in your opinion then would be—and further assuming the accident which occurred on November 22nd in which this man received a head injury where he was unconscious from six weeks to three months, which, in your opinion, then, caused the man's condition today, that is, cerebral arteriosclerosis, paralysis agitans or the automobile accident?

"A. Well, I would say this, that the automobile accident itself with the already present pre-existconditions are all to blame here. This man could well have possibly fully regained or recovered from the automobile accident, the head injury itself if he did not already have the pre-existing condition. That is trying to base it upon the fact of usual head injuries. In other words, usual head injuries, even with this period of unconsciousness do not usually end up with a history of impairment but if you place all three factors together and you are already dealing with a diseased or impaired brain and lay a head injury down on top of it, now you are dealing in different terms.

"Q. And it is your opinion if the the automobile accident did not put this man in and of itself did not put this man in his condition, that it aggravated his present condition?

"A. That is correct.

"Q. And placed him in this position today?

"A. That is correct."

The Oklahoma highway trooper, Don Mentzer, who arrived at the scene of the accident testified concerning the injuries received by Mr. Holman to his head. Also, the plaintiff, wife of Mr. Holman, and the witness, Mrs. Donnie Holman, likewise testified as to the location and extent of the injuries, but, of course, the layman witnesses did not undertake to testify as to the effect of such injuries.

2. Before reaching the consideration of the question of the amount of damages which should be awarded the plaintiff, the court had substantially set forth the facts as to the nature and extent of the injuries, but in view of the contention of the defendant as to the sufficiency of the testimony to sustain an award, the court feels that it is justified in setting out verbatim portions of the testimony of Dr. Lockhart.

As heretofore stated, the condition of Mr. Holman is such that he is helpless and will require for the remainder of his life constant care and attention. The plaintiff contends that the court should accept the life expectancy of 12 years as the period during which the expenditures for the care of Mr. Holman as shown by the evidence will be necessary. In compiling actuarial tables and projecting life expectancy, the actuary presupposes a person of average physical condition and health in the age group. The value of such projection as a guide in the instant case is questionable since Mr. Holman suffers from two diseases, which in the normal course of their duration probably will decrease what otherwise would be a normal life span. It cannot be said that Mr. Holman has a life expectancy which reasonably approaches the life expectancy of the average person of his age when his particular physical condition is considered.

Mr. Holman was not employed at the time of the accident. He had retired and no claim for past or future lost earnings is involved. Claim is made for past and future pain, suffering, mental anguish and permanent disability. He was unconscious for a considerable period of time, but while he was in the Veterans Hospital and other government institutions, his actions, as detailed by persons who visited him, convince the court that he did suffer pain and, no doubt, continues to suffer pain, and in all probability realizes he is and will continue to be entirely dependent upon others to supply his simplest needs and desires. In other words, the remainder of his life will be spent in a rest home or similar institution.

On re-cross examination by counsel for defendant, the examining physician testified as follows:

"Q. I believe I understood you to say that he could have his present condition today without the automobile accident?

"A. I said only in terms, Mr. Harper, that it is conceivable that he could from this, but I would doubt he would have this rapid progression.

"Q. Well, it was exactly ten months from the time of this injury to your examination?

"A. That's correct.

"Q. You are unable, I assume, to to say how far these other diseases might have progressed during that ten months period if this accident had not occurred?

"A. That is true.

"Q. They could progress rather rapidly.

"A. They can progress rapidly.

"Q. And do?

"A. And do.

"Q. Now, the symptoms that Mrs. Holman recited to you, would you repeat what she said, the symptoms Mrs. Holman gave you prior to the accident?

"A. That this man had been having some degree of slow down of motor abilities as well as mouth impairment and memory prior to the accident.

"Q. Now, those symptoms, I take it, are consistent with cerebral arteriosclerosis and paralysis agitans?

"A. That is correct."

A consideration of all of the testimony, both lay and professional, convinces the court that it should not accept the declared life expectancy of 12 years as being his life expectancy since the accident, but the court believes that a reasonable time would be seven years. The minimum cost during that time for care and attention will be $25,200 for nursing home, $2,555 for medicine, and $420 for professional services of a physician, or a total of $28,175, and that sum reduced to its present value at 6 percent amounts to $19,866.02, which amount should be awarded to the plaintiff. In addition thereto the plaintiff is entitled to recover $714.65 for past medical expense, and for past and future pain,

suffering, mental anguish and permanent physical disability the sum of $20,-000, or a total of $40,580.67.

Therefore, judgment is being entered today for the plaintiff, Ethel Holman, as Guardian of M. C. Mac Holman, for the sum of $40,580.67, together with all costs.